# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jane Bowman,                                  :
                          Petitioner          :
                                              :
              v.                              :    No. 379 C.D. 2017
                                              :    Submitted:  August 11, 2017
Pennsylvania Housing Finance                  :
Agency,                                       :
                          Respondent          :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


<u>OPINION NOT REPORTED</u>


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                         **FILED:  November 14, 2017**

Jane Bowman (Petitioner), pro se, petitions for review of a February 11, 2017 Order of a Hearing Examiner of the Pennsylvania Housing Finance Agency (PHFA) affirming PHFA's December 16, 2016 denial of her application for an emergency mortgage assistance loan (HEMAP loan) under the Act commonly known as the "Homeowners' Emergency Mortgage Assistance Loan Program" (Act 91).[1] Petitioner contends that PHFA erred in determining that she failed to meet the criteria for a HEMAP loan.  After review, we affirm.

## I.    Factual and Procedural Background

---

[1] Act of December 3, 1959, P.L. 1688, added by Section 2 of the Act of December 23, 1983, P.L. 385, *as amended*, 35 P.S. §§ 1680.401c - 1680.412c.

## A. Terms of Petitioner's Mortgage/Default

On August 27, 2007, Petitioner purchased a home in Parkesburg, Pennsylvania, for $288,000, financing the purchase with a $278,000 loan from Wells Fargo Bank (Wells Fargo), which Wells Fargo secured by a mortgage against Petitioner's home. The terms of the loan called for a 30-year mortgage at a fixed rate of interest of 6.625 percent. In 2010, when Petitioner had difficulty making her mortgage payments, she obtained a modification of her loan, receiving a step-rate interest rate of two percent, which was subsequently increased to three percent, and, then, on September 1, 2016, to four percent.

On July 6, 2016, Wells Fargo notified Petitioner that her loan was in default, that she had not paid her monthly mortgage payments from June 2015 through July 2016, and that she needed to pay $23,667.59, plus any mortgage payments and late charges due in the next 30 days, in order to cure the default or Wells Fargo would foreclose on the mortgage.

## B. Petitioner's Application for HEMAP Relief and Denial

On August 29, 2016, PHFA received an application from Petitioner for a HEMAP loan. PHFA denied Petitioner's application by letter dated December 16, 2016, citing the following reasons:

1. No reasonable prospect of applicant resuming full mortgage payments within twenty-four (24) months from the date of the mortgage delinquency and paying the mortgage(s) by maturity based on: Applicant's income is insufficient to maintain mortgage.

2. No reasonable prospect of applicant resuming full mortgage payments within twenty-four (24) months from the date of the mortgage delinquency and paying the mortgage(s) by maturity

2

based on: Applicant's income has been insufficient to maintain mortgage for the past two (2) years.

3. Applicant is not suffering financial hardship due to circumstances beyond applicant's control based on: Financial hardship is due to overextension.

(Reproduced Record (R.R.) Item 14.)

### C.    *Petitioner's Appeal and the Administrative Hearing*

Petitioner appealed PHFA's denial of her application for a HEMAP loan and received an administrative appeal hearing before a PHFA Hearing Examiner. On January 24, 2017, the Hearing Examiner held a telephonic hearing at which Petitioner testified.

According to Petitioner's testimony and the evidence presented at the administrative appeal hearing, her financial circumstances began to decline in February 2014 when her mother unexpectedly passed away. Petitioner's mother had been living with Petitioner since 2007. Beginning in 2009 or 2010, Petitioner's mother started paying Petitioner $1,500 a month as rent for herself, her son, and his daughter and grandson.

The Hearing Examiner reviewed Petitioner's 2013, 2014, and 2015 federal tax records. In 2013, Petitioner earned "taxable income" of $36,441, which the Hearing Examiner multiplied by 75 percent to account for federal, state, and local taxes, resulting in an average monthly net income of $2,278.[2]  (Certified Record (C.R.) Item 64, Hr'g Tr. at 4, Jan. 24, 2017, Supplemental Reproduced Record (S.R.R.) at 36b.)  In 2014, Petitioner earned "taxable income" of $14,635, which, when federal, state, and local taxes were deducted, resulted in an average monthly net income of

---

[2] Act 91 defines "net effective income" as "gross household income less city, State and Federal income and social security taxes."  Section 405-C(b) of Act 91, 35 P.S. § 1680.405c(b).

$915. (*Id.*) Petitioner also received, in 2014, $120,970 from her mother as a death benefit, but, the Hearing Examiner noted, PHFA does not include lump sum payments from annuities or pensions as earned income. (*Id.*) In 2015, Petitioner earned "taxable income" of $13,087, which, when federal, state, and local taxes were deducted, resulted in an average monthly net income of $818. (*Id.*)

At the time of Petitioner's application, the Hearing Examiner noted, Petitioner's monthly expenses were as follows: $1,569 for her mortgage; $210 in utilities; $41 in homeowners' association fees; $475 in debt installments; and $765 in monthly living expenses. Thus, in total, Petitioner's monthly expenses were $3,060, which exceeded her average monthly net income for the years 2013, 2014, and 2015. Petitioner used some of the money she had received from her mother as a death benefit to pay her mortgage until June 2015 when those funds were exhausted. Petitioner explained that those funds eventually ran out because she also had to use that money to pay expenses related to administering her mother's estate and part of the money went to her eight siblings.

Regarding Petitioner's employment history, she worked as a regional accountant for Helix Healthcare Management Company from 2006 until 2008 when the company closed. Petitioner then worked as a substitute teacher.

In 2010, Petitioner started working as a tax preparer and consultant with Ocran and Associates (Ocran). That employment was only seasonal, from January until April. In 2015 and 2016, Petitioner earned $6,000 and $4,200, respectively, with Ocran. At the time of the hearing, Petitioner was earning seasonal pay of $600 per week with Ocran. Also, beginning around 2010, and continuing forward, Petitioner worked part-time for First Baptist Church (First Baptist), earning about $300 a month.

4

In 2012, Petitioner accepted employment as an accounts payable accountant with Jewish Community Center (JCC). In March 2014, however, Petitioner resigned from her employment with JCC. Petitioner explained that she left the month following her mother's death. Petitioner was depressed and she resigned because she "assum[ed]" that JCC was going to terminate her employment because of budgeting issues, and she could not "fight the fight." (Hr'g Tr. at 5-6, 10, S.R.R at 37b-38b, 42b.)

Between March 2014 and January 2016, Petitioner's only employment was with Ocran and First Baptist. In January 2016, Petitioner accepted employment with Human Services, Inc. On September 2, 2016, however, Human Services terminated Petitioner's employment, citing, in a letter addressed to Petitioner, performance-related issues. (C.R. Item 39, Termination of Employment Letter.) Specifically, the letter stated that Petitioner had submitted monthly profit and loss reports with errors and in an untimely fashion. (*Id.*) Petitioner then did not correct the errors in a timely fashion. Human Services warned Petitioner about the quality of her work in July 2016, but her reports continued to be inaccurate and untimely. Thus, Human Services terminated Petitioner's employment on September 2, 2016. (*Id.*) Petitioner testified that she was told that she could resign or be terminated, and she opted for termination because it was "a very unhealthy environment" and she thought she could then collect unemployment benefits. (Hr'g Tr. at 10, S.R.R. at 42b.) Petitioner also alluded to being "the fall person." (Hr'g Tr. at 11, S.R.R. at 43b.) Petitioner was denied unemployment benefits because she had not earned sufficient income in her base year to qualify for benefits. Petitioner earned $32,185 in 2016 at Human Services.

At the time of the hearing, in addition to Petitioner's earnings from Ocran and First Baptist, Petitioner earned approximately $170 a week at Turkey Hill (20 hours per week at $8.50 an hour).  Petitioner had also received, in 2016, three months of rent or $375 from a tenant who was renting part of Petitioner's home, but he had stopped paying, and Petitioner intended to evict him and to rent to someone else who would pay $450 to $650 a month.[3]

Petitioner also testified that she had received an offer of employment as an accountant with Northern Children Services (NCS).  According to a letter from NCS dated February 6, 2017, which, with the Hearing Examiner's permission, Petitioner submitted after the hearing, she would begin her employment with NCS on February 6, 2017, and she would work "no more than 28 hours per week" at a rate of $25 per hour.  (NCS Letter dated Feb. 6, 2017, R.R. Item 17.)

As for Petitioner's monthly expenses at the time of the hearing, they were as follows:  $1,821.63 on her mortgage;[4] $41 in homeowners' association fees; approximately $210 for electricity, water, sewer, and trash; $450 in debt installments (Chase – $150, Discover – $200, and Sears – $100); $30 for pet food; $85 for cell phone service; $250 for internet, home phone, and television; $120 for auto insurance; $40 for gasoline; $13 for car maintenance; $30 in church donations; $50 in food, toiletries, cleaning supplies, and paper products (Petitioner was receiving assistance from a friend with these items); and $50 in entertainment.  Thus, in total, at the time of the hearing, Petitioner's monthly expenses were $3,190.63.

---

[3] In a letter dated November 20, 2016, addressed to Petitioner's tenant, Petitioner informed her tenant that effective January 1, 2017, his rent would increase to $450 per month, that rent must be timely received, and, if it were not, Petitioner would evict him.  Petitioner noted that she "must receive rent in order to receive financial help from an agency for her housing hardship."  (C.R. at Item 40, Delinquent Rent Letter dated November 20, 2016.)

[4] The interest on Petitioner's loan was set to rise again on September 1, 2017, to 4.5 percent, at which point the interest rate will cap for the remainder of the loan.

Petitioner testified that she had no savings that she could apply towards the amount she owed on the mortgage. She believed she could start making full monthly mortgage payments beginning in February.

### D.    Hearing Examiner's Order

By notice of Order dated February 11, 2017, the Hearing Examiner affirmed PHFA's determination denying Petitioner's application for a HEMAP loan. (Examiner's Decision at 7.) The Hearing Examiner found that the three grounds PHFA gave for denying Petitioner's HEMAP loan – that she is not suffering a financial hardship due to circumstances beyond her control because her financial hardship is due to overextension, and that there is no reasonable prospect of her resuming full mortgage payments within 24 months of the date of her mortgage delinquency and paying the mortgage by maturity because her income is insufficient to maintain the mortgage and has been for the past two years – were supported by the evidence.

Regarding financial hardship, the Hearing Examiner noted that while Petitioner was employed with JCC in 2012 and 2013, she "voluntarily terminated" her employment in March 2014 because she was depressed over her mother's death. (*Id.* at 2, 6.) The death of Petitioner's mother, the Hearing Examiner stated, resulted in "a substantial [loss] of income to the household." (*Id.* at 2.) For the next two years, other than part-time employment with First Baptist and Ocran, Petitioner "was essentially unemployed." (*Id.* at 6.)

In January 2016, Petitioner accepted employment with Human Services while keeping her part-time positions with First Baptist and Ocran. (*Id.* at 2, 6.) However, in early September 2016, Petitioner was "voluntarily terminated" from her

7

employment with Human Services. (*Id.* at 2.) In other places, however, the Hearing Examiner described Petitioner as being "forced to resign" from Human Services. (*Id.* at 2, 6.) The Hearing Examiner recounted that Petitioner testified that "she was told she needed to resign or be terminated. Therefore, she voluntarily resigned this position." (*Id.* at 2.)

The Hearing Examiner said that PHFA considered an applicant's federal income tax returns "to be the reliable and consistent source of verifiable income." (*Id.* at 6.) Based on Petitioner's income tax returns, the Hearing Examiner noted, Petitioner's average monthly net income was $2,278 in 2013, $915 in 2014, and $818 in 2015, while her expenses at the time of her HEMAP application were $3,060. (*Id.* at 2-3, 5.) Therefore, Petitioner's expenses exceeded her income, which constituted financial overextension, and financial overextension was not considered a circumstance beyond Petitioner's control. (*Id.* at 6.)

In addition, Petitioner's total monthly housing expenses of $1,820 were no less than 67 percent of Petitioner's average monthly net income since at least 2013. (*Id.*) Even in 2016, when Petitioner's average monthly net income had risen to $2,704, the $1,950 she would have to pay in monthly housing expenses, due to the mortgage rate increase, would constitute "62%" of her average monthly net income.[5] (*Id.* at 6-7.) The Hearing Examiner said that PHFA believed that no more than 40 percent of a mortgagor's average monthly net income should be devoted toward maintaining one's total housing expenses if one was to be successful at making those payments. (*Id.* at 6.) That Petitioner's monthly housing expenses exceeded the 40 percent threshold showed that she was overextended financially. (*Id.*) For this same

---

[5] In fact, $1,950 of $2,704 is 72 percent.

reason, along with Petitioner's lack of savings to pay the mortgage, she had not generated sufficient income to pay her mortgage since at least 2013. (*Id.* at 7.)

Finally, the Hearing Examiner found there was no reasonable prospect of Petitioner resuming full mortgage payments within 24 months from the date of her delinquency on the mortgage and paying the mortgage by maturity. (*Id.*) At the time of the hearing, the Hearing Examiner noted, Petitioner's average monthly net income was $1,194, consisting of $225 from First Baptist, $275 from Ocran, and $694.35 from Turkey Hill. (*Id.* at 3-4.) Petitioner claimed that, effective February 2017, her income would increase to $3,467, owing to an additional $2,273.25 she would be earning with NCS. (*Id.* at 4.) However, because Petitioner did not have a "sufficient history of . . . employment" with NCS, this additional income could not be considered "as a consistent and reliable source of employment/income." (*Id.* at 7.) Seeing as the only consistent and reliable sources of income came from Petitioner's seasonal employment at Ocran and her part-time positions at First Baptist and Turkey Hill, the Hearing Examiner concluded that there was no reasonable prospect that Petitioner would resume making full mortgage payments within 24 months from the date of her delinquency on the mortgage and continue to do so until the mortgage matured. (*Id.*)

## II. Analysis

On appeal to this Court, Petitioner argues that the Hearing Examiner should have reversed PHFA's determination denying her application for a HEMAP loan.[6]

---

[6] Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact are not supported by

9

Petitioner contends that she suffered a financial hardship beyond her control when her mother unexpectedly passed away, which caused Petitioner to lose $1,500 a month in rental income. In addition, Petitioner argues that the death of her mother left Petitioner depressed and grieving, which caused her to make "unwise decisions," such as voluntarily resigning her position as an accountant at JCC. (Petitioner's Br. at 12.) Although Petitioner secured a position with Human Services in 2016, Human Services terminated her only nine months later. She hoped to receive unemployment benefits following her termination, but she was denied those benefits, which caused her financial hardship. Petitioner contends that she would have been able to resume making mortgage payments within 24 months of the date of delinquency, that is, beginning in May 2017. Petitioner asserts that by then her monthly net income was $5,713.25, consisting of $300 from First Baptist, $2,540 from Ocran, $600 from Turkey Hill, and $2,273.25 from NCS. With expenses of only $3,169, Petitioner has a surplus each month of $2,544.25, which demonstrates that she has a reasonable prospect of resuming mortgage payments by May 2017 and paying the mortgage by the date of maturity.

### A. Reasonable Prospect

In order to qualify for a HEMAP loan, a mortgagor must show that she meets the eligibility criteria in Act 91. Section 404-C(a) of Act 91, 35 P.S. § 1680.404c(a); *Coyne v. Pa. Hous. Fin. Agency*, 826 A.2d 925, 926 n.3 (Pa. Cmwlth. 2003). Among the criteria the mortgagor must establish are "that there is a reasonable prospect that

---

substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Hessler v. Pa. Hous. Fin. Agency*, 500 A.2d 914, 915 n.1 (Pa. Cmwlth. 1985).

[she] will be able to resume full mortgage payments within twenty-four (24) months after the beginning of the period for which assistance payments are provided . . . and pay the mortgage . . . in full by its maturity" unless the mortgagee agrees to a later date. 35 P.S. § 1680.404c(a)(5). Act 91 does not define "reasonable prospect." However, the legislature delegated authority to PHFA to establish appropriate rules, standards, and regulations to implement Act 91. Section 401-C of Act 91, 35 P.S. §1680.401c; *Anela v. Pa. Hous. Fin. Agency*, 690 A.2d 1157, 1159 (Pa. 1997). Thus, PHFA's interpretation of Act 91 is "entitled to great weight[,]" and we will not overturn it unless it is "clearly erroneous." *Horton v. Pa. Hous. Fin. Agency*, 511 A.2d 917, 918 (Pa. Cmwlth. 1986). At the same time, the objective of Act 91 is "remedial and humanitarian[,]" and this Court will "interpret its assistance provisions liberally and broadly to effect its purposes." *Harman v. Pa. Hous. Fin. Agency*, 529 A.2d 1153, 1157 (Pa. Cmwlth. 1987); *see* Section 601-A of the Housing Finance Agency Law, 35 P.S. § 1680.601a ("This act, being necessary for the welfare of the Commonwealth and its inhabitants, shall be liberally construed to effect the purposes thereof.").[7] PHFA has issued a policy statement interpreting "reasonable prospect." Section 31.206 of the Policy Statement states:

> (a)    In general, the Agency will consider all relevant factors when evaluating whether the homeowner has a reasonable prospect of being able to resume full mortgage payments within 24 months after the beginning of the period for which assistance payments are provided the Agency and of being able to pay the mortgage in full by maturity or by a later date agreed to by the mortgagee, including the following:

---

[7] Act of December 3, 1959, P.L. 1688, added by Section 4 of the Act of December 5, 1972, P.L. 1259.

11

(1) The homeowner's prior work history, experience, training, opportunities for retraining and similar factors which may affect the homeowner's future employment opportunities.

(2) Potential for future changes in the homeowner's financial prospects through re-employment, schooling, training or debt reduction, or other income changes sufficient to enable the homeowner to resume full mortgage payments.

(3) Noncash benefits that may reduce household expenses, such as food stamps, free medical services for military or low-income families, a company-provided automobile, or receipt of food or clothing from family members living outside the household.

****

(7) A homeowner's demonstrated ability to make regular monthly mortgage payments, even though those payments represented most of the homeowner's income. In determining whether the homeowner's future job and income prospects will be sufficient to enable the homeowner to pay the mortgage debt--including principal, interest, taxes and insurance--the Agency will take into consideration the amount of household income available to the homeowner for a reasonable period of time not to exceed 24 months prior to the circumstances which caused the mortgage delinquency and whether the income was sufficient as evidenced by documentation, including tax returns, Internal Revenue Service Form W-2 and tax transcripts. . . .

(b) The Agency will generally determine that a homeowner demonstrates a reasonable prospect of resuming mortgage payments and paying the mortgage by maturity, despite his current unemployment, if the homeowner is suffering a financial hardship through no fault of his own and can demonstrate the following:

(1) A favorable work and credit history.

(2) The ability and history of paying the mortgage when employed.

12

(3) The lack of an impediment or disability that prevents reemployment.

(4) That he is actively seeking work, as evidenced by a written statement to that effect.

12 Pa. Code § 31.206.[8] Satisfaction of the factors contained in Section 31.206(b) of the Policy Statement does not necessarily compel the conclusion that a mortgagor is qualified for a HEMAP loan. Rather, PHFA "is free to consider in toto th[e] four factors [in Section 31.206(b) of the Policy Statement], as well as others, and then, based on that guidance and [its] own judgment, decide whether an applicant is qualified for mortgage assistance." *R.M. v. Pa. Hous. Fin. Agency*, 740 A.2d 302, 307 (Pa. Cmwlth. 1999). PHFA "cannot base its determination on speculative income." *Cullins v. Pa. Hous. Fin. Agency*, 623 A.2d 951, 954 (Pa. Cmwlth. 1993). Rather, PHFA "is bound to evaluate [a mortgagor's] eligibility on the basis of [her] actual income history." *Id.*

Here, we cannot find that the Hearing Examiner erred or abused her discretion in determining that Petitioner has not shown that she will be able to generate sufficient income to resume making full mortgage payments within 24 months of the date of her delinquency, i.e., by May 2017 and pay the mortgage by maturity. Petitioner mistakenly contends that by May 2017 she would have been earning $5,713.25 a month. Petitioner's figure is based, in part, on her earning $2,540 a month from Ocran. Her employment with Ocran, however, is only seasonal. In all of 2015 and 2016, Petitioner earned only $6,000 and $4,200, respectively, with

---

[8] Section 31.206 of the Policy Statement "is a statement of policy, not a regulation, and thus does not have the force and effect of law." *R.M. v. Pa. Hous. Fin. Agency*, 740 A.2d 302, 308 (Pa. Cmwlth. 1999).

13

Ocran. Thus, her claim that she will earn $2,540 **a month** from Ocran is not supported by the record.

Further, we cannot find that the Hearing Examiner erred or abused her discretion in effectively concluding that the income Petitioner could expect to earn from her employment with NCS was speculative. The offer letter from NCS showed that Petitioner had an offer of guaranteed employment. *Cf. R.M.*, 740 A.2d at 308 (holding that mortgagor's claim that he could now expect to earn as an attorney between $280,000 and $300,000 following his recovery from an illness, which was based on a letter from a vocational expert, was speculative). Nevertheless, as PHFA contends, the offer letter was speculative as to the monthly amount of income Petitioner could expect to receive from her job with NCS. The offer letter stated that Petitioner would work "**no more than** 28 hours per week." (NCS Letter dated Feb. 6, 2017, R.R. Item 17 (emphasis added).) It may be that Petitioner will work 28 hours each week or that her hours will vary from week to week. In other words, the offer letter established only her **maximum** permissible working hours and did not indicate the minimum number of hours that Petitioner could expect to work each week. *See Cullins*, 623 A.2d at 952, 954 (finding that because the husband-mortgagor did not provide evidence of guaranteed hours in future job positions other than his testimony that he anticipated beginning work at a department store for a maximum of 40 hours per week at $6.50 an hour and at a position obtained through a temporary agency, the hearing examiner did not err as a matter of law in determining that appellants did not have a reasonable prospect of resuming mortgage payments in the requisite time period); *Harman*, 529 A.2d at 1156 & n.7 (concluding that it was not an abuse of discretion for hearing examiner to refuse to include in his calculation $275 per month mortgagor claimed she would receive from decorating

14

contracts effective as of the date of the hearing because it was only "a possibility of future income in a calculation of present monthly net income").

Because there is substantial evidence to support the Hearing Officer's finding that Petitioner's potential income from NCS is not consistent or reliable, and because the $1,194 in income generated from Ocran, First Baptist, and Turkey Hill would not be sufficient income to pay her housing expenses of $1,950, we cannot find that the Hearing Officer erred or abused her discretion when she concluded that Petitioner did not have a reasonable prospect of resuming full mortgage payments within 24 months of the date of her mortgage delinquency and paying the mortgage off by its maturity.[9]


### B. Financial Hardship

Petitioner's failure to satisfy the reasonable prospect element of Act 91 is dispositive of her application for a HEMAP loan. However, we write briefly to highlight the errors the Hearing Examiner made when considering the issue of financial hardship.

Act 91 provides that the mortgagor must establish that she "is suffering financial hardship due to circumstances beyond the mortgagor's control which render the mortgagor unable to correct the delinquency or delinquencies within a reasonable time and make full mortgage payments." 35 P.S. § 1680.404c(a)(4). Act 91 does not define the phrase "circumstances beyond the mortgagor's control." However, Act 91 indicates that PHFA "may consider information regarding the mortgagor's employment record, credit history and current income." 35 P.S. § 1680.404c(a)(10). On the issue of the mortgagor's employment record, PHFA's

---

[9] A mortgagor may reapply for assistance from PHFA if "there is a material change in circumstances." 35 P.S. §1680.404c(b).

HEMAP Policy Statement adds that "[u]nemployment or underemployment, through no fault of the homeowner" are examples of circumstances beyond the mortgagor's control that result in financial hardship to the mortgagor. 12 Pa. Code. § 31.205(b)(1).[10] In contrast, PHFA will not consider "[t]ermination of employment by the homeowner without a necessitous cause or termination of the homeowner's employment by an employer for willful misconduct" to be circumstances beyond the mortgagor's control. 12 Pa. Code § 31.205(c)(2). Section 31.205 of the Policy Statement does not define "necessitous cause" or "willful misconduct." However, these same terms appear in Section 402(b) and (e) of the Unemployment Compensation (UC) Law.[11]

In concluding that Petitioner did not suffer a financial hardship due to circumstances beyond her control, the Hearing Examiner found both that Petitioner "voluntarily terminated" her position with Human Services and that she was "forced to resign." (Examiner's Decision at 2, 6.) These findings are inconsistent. *See Pa. Liquor Control Bd. v. Unemployment Comp. Bd. of Review*, 648 A.2d 124, 126 (Pa. Cmwlth. 1994) (noting that an employee who resigns in order to avoid an imminent discharge has not voluntarily resigned but has been discharged and is entitled to UC benefits if she has not committed willful misconduct). If Petitioner was forced to resign in order to avoid an imminent discharge and did not commit an act of willful misconduct, it may have been that the termination of her employment with Human Services was through no fault of her own, and the loss of that employment, in

---

[10] We have never held that 12 Pa. Code § 31.205 is a statement of policy and not a regulation, but, as noted, we have held that the section that follows it, 12 Pa. Code § 31.206, is a statement of policy, and all of subchapter B of chapter 31 of the Pennsylvania Code, which addresses HEMAP, is referred to as a "policy statement."

[11] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b), (e).

16

combination with the death of her mother and the resultant loss of $1,500 a month in rental income, constituted a financial hardship due to circumstances beyond Petitioner's control. Thus, had Petitioner not failed to satisfy the reasonable prospect element, we would have remanded this matter for the Hearing Examiner to resolve this inconsistency on the issue of financial hardship.

## III. Conclusion

Because there is substantial evidence to support the Hearing Examiner's findings, we cannot find that she erred or abused her discretion when she concluded that Petitioner did not have a reasonable prospect of resuming full mortgage payments within 24 months of the date of her mortgage delinquency and paying the mortgage in full by maturity. Therefore, we affirm the Order of February 11, 2017.

 

**RENÉE COHN JUBELIRER,** Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Jane Bowman, :
              Petitioner :
 :
         v. : No. 379 C.D. 2017
 :
Pennsylvania Housing Finance : 
Agency, :
          Respondent :

# **O R D E R**

    **NOW**, November 14, 2017, the February 11, 2017 Order of the Pennsylvania Housing Finance Agency, entered in the above-captioned matter, is hereby **AFFIRMED.**

_____
**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jane Bowman,                              :
                 Petitioner    :
                                      :
         v.                               :
                                        :
Pennsylvania Housing                      :
Finance Agency,                           :   No. 379 C.D. 2017
                 Respondent   :   Submitted: August 11, 2017


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE JOSEPH M. COSGROVE, Judge


OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE COSGROVE                FILED: November 14, 2017


        As the Hearing Officer's errors are not separable from the remainder of

her conclusions, I dissent and would remand this matter for further proceedings.


                                 _____
                                 JOSEPH M. COSGROVE, Judge